[Cite as *Singhaus v. Zumber*, 2015-Ohio-4755.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| ANGELA M. SINGHAUS | JUDGES:<br>Hon. John W. Wise, P. J. |
| Petitioner-Appellee | Hon. Patricia A. Delaney, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2015 AP 02 0007 |
| ADRIAN F. ZUMBAR | |
| Respondent-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:     Civil Appeal from the Court of Common
Pleas, Case No.  2015 VI 01 0004


JUDGMENT:     Affirmed


DATE OF JUDGMENT ENTRY:     November 17, 2015


APPEARANCES:

For Petitioner-Appellee          For Respondent-Appellant

DEBORAH E. GREENHAM          ERICK L. BAUER
Post Office Box 711          204 West High Avenue
New Philadelphia, Ohio  44663          New Philadelphia, Ohio  44663

*Wise, P. J.*

**{¶1}.** Appellant Adrian F. Zumbar appeals the granting of a domestic violence civil protection order ("DVCPO") against him by the Court of Common Pleas, Tuscarawas County. The relevant facts leading to this appeal are as follows.

**{¶2}.** Petitioner-Appellee Singhaus and Respondent-Appellant Zumbar were formerly married. They have two teenage children together, P.Z. (a son) and F.Z. (a daughter).[1] Pursuant to the terms of the 2009 divorce between appellant and appellee, each parent is to spend an equal amount of time with the children under a shared parenting plan.

**{¶3}.** On January 3, 2015, P.Z. and F.Z. were at appellant's home in Dover, Ohio. P.Z., then age fifteen, spent some of his time that day texting messages on his cell phone. At some point, a disagreement over P.Z.'s use of his cell phone ensued, which P. Z. later testified became physical. Appellant told P.Z. to put aside the phone or else he would take it. When appellant attempted to do so, P.Z. became more upset and exited the house. Appellant followed him outside, instructing him to come back in. P.Z. refused, kept walking, and called his mother, appellee. Appellant gave up following P.Z. on foot and went back to the house to get P.Z.'s thirteen-year-old sister, F.Z. Appellant and F.Z. then followed P.Z. in appellant's van. P.Z. refused to get in the vehicle and come home.

**{¶4}.** P.Z. eventually decided to call 911. Officers from the Dover Police Department responded. After taking statements from appellant and P.Z., the responding

---

[1] Because both children have first names starting with the letter "P," we will hereinafter refer to the female child as "F.Z."

officers asked appellant to permit both children to stay with appellee that night. Appellant conceded to the request.

{¶5}. As a result of these events, Appellee Singhaus filed a petition for a domestic violence civil protection order ("DVCPO") in the Court of Common Pleas, Tuscarawas County, on January 6, 2015. Said petition was filed against Appellant Zumbar on behalf of the two children. Appellee filed an amendment to the petition the same day, reciting additional alleged facts.

{¶6}. An ex-parte hearing was conducted on January 6, 2015. Appellee Singhaus was present; Appellant Zumbar was not. At the conclusion of the hearing, appellee was granted an *ex parte* order, prohibiting appellant from having any contact with his two children and/or appellee.

{¶7}. On January 20 and 23, 2015, a full hearing was conducted on the DVCPO petition.

{¶8}. On January 28, 2015, the lower court issued a domestic violence civil protection order against appellant for the protection of P.Z. However, appellee and F.Z. were not listed on the final order.

{¶9}. On February 18, 2015, appellant filed a notice of appeal. He herein raises the following sole Assignment of Error:

{¶10}. "I. THE TRIAL COURT ERRED IN GRANTING A CIVIL PROTECTION ORDER AGAINST THE RESPONDENT, ADRIAN F. ZUMBAR."

I.

{¶11}. In his sole Assignment of Error, appellant argues the trial court erred in granting a domestic violence civil protection order against him. We disagree.

**{¶12}.** A person seeking a civil protection order must prove domestic violence or danger of domestic violence by a preponderance of the evidence. *Felton v. Felton* (1997), 79 Ohio St.3d 34, 42, 679 N.E.2d 672. Domestic violence is defined by R.C. 3113.31, and includes attempting to cause or recklessly causing a family or household member bodily injury, or placing that person by threat of force in fear of imminent serious physical harm. In *Felton, supra*, the Ohio Supreme Court noted that "[t]he General Assembly enacted the domestic violence statutes specifically to criminalize those activities commonly known as domestic violence and to authorize a court to issue protection orders designed to ensure the safety and protection of a complainant in a domestic violence case." *Id.* at 37, 679 N.E.2d 672, citing Ohio Legislative Service Commission, Summary of 1978 Enactments, June-December (1979), at 9-14 (additional citations omitted). The decision on whether to grant a civil protection order lies within the sound discretion of the trial court. *Olenik v. Huff,* 5th Dist. Ashland No. 02-COA-058, 2003-Ohio-4621, ¶ 21.

**{¶13}.** In *State v. Awan* (1986), 22 Ohio St.3d 120, 123, 489 N.E.2d 277, the Ohio Supreme Court noted the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact, and an appellate court may not substitute its judgment for that of the fact finder. A trial court is in a much better position than an appellate court to weigh the evidence, because it views the witnesses, and observes their demeanor, gestures, and inflections. *See Seasons Coal Company v. Cleveland* (1984), 10 Ohio St.3d 77, 461 N.E.2d 1273. The fact finder is free to believe all, part, or none of the testimony of each witness. *See State v. Caldwell* (1992), 79 Ohio App.3d 667, 679, 607 N.E.2d 1096. Therefore, a judgment supported by competent and

credible evidence going to all the elements of the case generally will not be disturbed by a reviewing court. *See Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 488 N.E.2d 857.

{¶14}. The first full evidentiary hearing, conducted on January 20, 2015, consisted solely of the testimony of P.Z. Due to time constraints, the hearing was continued until January 23, 2015, allowing testimony from appellee, along with her current husband, William Singhaus. The trial court also heard from appellant, as well as Dover police officer Michelle Seibert and the prosecuting attorney for the City of Dover, Ron Collins.

*Summary of Testimony of P.Z.*

{¶15}. According to P.Z., on January 3, 2015, he sent texts to both his girlfriend and appellee. Tr. at 16. P.Z. testified that at one point, appellant asked him about appellee's texts, referring to her as a "piece of shit." Tr. at 16. P.Z. also told the court appellant has called him names such as "pussy" and "asshole," and stated that appellant has used swear words against him since he was little. Tr. at 17. However, the spark that set off the events of January 3, 2015 appears to have been appellant's inquiry into either a message or a picture he observed on P.Z. 's phone. P.Z. testified that when he attempted to keep the cell phone to himself, appellant grabbed and pushed him (Tr. at 17, 32) and then shoved him in the back. Tr. at 17-18. At one point, appellant grabbed him and told him to "get the fuck back here." Tr. at 18. He also stated that appellant was swinging punches at him as he tried to leave the house, requiring him to block one of the punches with his arms. Tr. at 17, 37. He later admitted he had no marks on him, although he had his coat on at that point. Tr. at 21, 37. He said his father had been drinking alcohol that day. Tr. at 21. He confirmed that appellant had told

him to put the phone away, but he refused. Tr. at 17, 29. After he left the house, P.Z. refused appellant's directions to come back inside. Tr. at 31. After P.Z. called 911, law enforcement officers arrived, and he informed them that his father had been drinking and had taken swings at him. T. 21, 35. P.Z. received no medical treatment as a result of the incident. Tr. at 36. However, he stated he remained afraid of appellant and did not want contact with him except via counseling. Tr. at 23.

### Summary of Testimony of Appellee and William Singhaus

{¶16}. The testimony indicates that appellee and her husband William Singhaus were each on the phone with P.Z. at some point during the events in question. *See* Tr. at 60, 81. Appellee focused her testimony on what she overheard when P.Z. called her. She testified that she heard appellant tell P.Z. to "get the fuck back here" and "[y]ou are my fucking son." Tr. at 58. She also heard appellant warn P.Z. that "you'll do what I tell you to do or else." *Id.* The sounds of screaming from both appellant and P.Z. were being transmitted, and appellee described P.Z. as "completely beside himself" when she finally saw him. Tr. at 59-60, 63. She feared for P.Z.'s safety as a result of the call. Tr. at 60. She admitted she did not hear hitting or slapping, but she "believed" such actions were going on. *See* Tr. at 66. Appellee's husband William, who has known P.Z. for more than four years, described the teenager during the call as "very upset, emotional, and frightened." Tr. at 82.

### Summary of Testimony of Appellant

{¶17}. Appellant emphasized that he and P.Z. had had recent issues with each other. Tr. at 105. In December 2014, for example, appellant had prohibited P.Z. from going to a friend's house due to what he terms as "secretive" behavior. Tr. at 106. On

January 2, 2015, P.Z. had refused to come home from the mall at a designated time. Appellant recalled that P.Z.  would not answer his phone and later told him that he and his friend had been unable to find their car in the parking lot. Tr. at 27, 107.

{¶18}. According to appellant, on the day in question, appellant pressed to see who was on the cell phone, but P.Z. would not cooperate and tried to hide the device. Tr. at 112. Appellant does not dispute that he intended to take the phone from P.Z. Tr. at 113. However, appellant denied any grabbing, shoving, physical contact or attempted punching with P.Z. Tr. at 113-114. Appellant further denied any drinking that day, and he testified he was not feeling well due to a sinus infection. Tr. at 114. He told the court that P.Z. became upset and was crying over the request to hand over the phone, leading to P.Z. grabbing his coat and leaving. Tr. at 115. Appellant recalled that he had informed P.Z. that he would not be going to go to his girlfriend's house the following Sunday due to recent behavior. Tr. at 115. When P.Z. exited the house, appellant told him to come back. Tr. at 116. After further demands to come back inside, P. Z. kept walking and refused to return home. Tr. at 118, Appellant denied using any foul language during the incident, other than telling P.Z. to "get his ass" home. Tr. at 118.

### *Testimony of Officer Michelle Seibert*

{¶19}. Michelle Seibert is a Dover police officer who responded to P.Z.'s 911 call on January 3, 2015, at about 10 PM. She was not an eyewitness to the altercation between appellant and P.Z.  She testified that she did not see appellant drinking, but she did not observe what was in the glasses on the kitchen table. Tr. at 99. In any case, she did let appellant drive F.Z. back home so the girl could collect her belongings before leaving with her mother. Tr. at 94. When Officer Seibert went back to the Zumbar home,

she saw no signs of a struggle. Tr. at 96. She did notice that F.Z. told appellant she loved him and she was sorry she had to leave. Tr. 97.

### Testimony of City Prosecutor Ron Collins

{¶20}. Attorney Collins was the city prosecutor for Dover, Ohio. Tr. at 137. He testified he had reviewed the police report and concluded the incidents of January 3, 2015 did not warrant a criminal prosecution. Tr. 138. As a result, no charges were ever filed against appellant or P.Z. Tr. at 138. However, he offered no opinion regarding any basis for a DVCPO. *Id.*

### Conclusion

{¶21}. We recognize the variance of the versions of events in this matter, particularly in regard to the testimony of appellant and P.Z. Appellant argues that he is a trustworthy twenty-eight year bank employee with no criminal record, and we surmise he questions the veracity of a physical father-son confrontation by mentioning that P.Z. is 6' 2" tall and weighs 249 pounds. *See* Appellant's Brief at 2, 4. He also makes the troubling claim, unfounded under Ohio law, that "[f]or this Court to put more weight on the stories of a 15-year-old boy is unconscionable." *Id.* Tr. at 8. However, we herein adhere to the principle that the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *See*, *e.g.*, *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180. Ultimately, "[t]he statutory criterion to determine whether or not to grant a civil order pursuant to R.C. 3113.31 is the existence or threatened existence of domestic violence." *Wetterman v. B.C.*, 9th Dist. Medina No. 12CA0021–M, 2013-Ohio-57, ¶ 11 (additional citations omitted).

{¶22}. Upon review of the record and exhibits in the case *sub judice*, we find sufficient competent, credible evidence to support a finding by the trier of fact that the DVCPO was warranted based on the existence of or threat of domestic violence against P.Z. and the potential danger to such child, and said decision was within the court's sound discretion.

{¶23}. Appellant's sole Assignment of Error is therefore overruled.

{¶24}. For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Tuscarawas County, Ohio, is hereby affirmed.

By: Wise, P. J.

Delaney, J., and

Baldwin, J., concur.

JWW/d 1026