[Cite as *Swartz v. Van Deest*, 2023-Ohio-1882.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| TONYA M. SWARTZ | JUDGES:<br>Hon. William B. Hoffman, P.J.<br>Hon. Patricia A. Delaney, J.<br>Hon. Craig R. Baldwin, J. |
| Appellee-Petitioner | |
| -vs- | Case No. 2022 CA 00080 |
| TRAVIS J. VAN DEEST | |
| Appellant-Respondent | O P I N I O N |


CHARACTER OF PROCEEDINGS:     Appeal from the Licking County Court of Common Pleas, Domestic Relations Division, Case No. 2022 DR 00490 DF

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     June 6, 2023

APPEARANCES:

For Appellee-Petitioner

DOUGLAS A. FUNKHOUSER
DEREK S. WELT
Douglas A. Funkhouser Co., L.P.A.
765 South High Street
Columbus, Ohio 43206

For Appellant-Respondent

TONYA M. SWARTZ
450 Huntsworth Drive
Johnstown, Ohio 43031

*Hoffman, P.J.*

**{¶1}** Respondent-appellant Travis J. Van Deest appeals the September 12, 2022 Judgment Entry and accompanying Opinion, which overruled his objections to the magistrate's July 5, 2022 order, granting petitioner-appellee Tonya M. Swartz a civil protection order ("CPO") against him.[1]

STATEMENT OF THE CASE AND FACTS

**{¶2}** On May 25, 2022, Appellee filed a Petition for Dating Violence Civil Protection Order pursuant to R.C. 3113.31. The trial court issued an ex parte CPO on the same day. The matter came on for a full hearing before the magistrate on June 28, 2022.

**{¶3}** Appellee testified she and Appellant met in 2016, and went on a couple of dates. Appellee explained, "I realized very quickly that he was not good for me." Transcript of June 28, 2022 Proceedings at 16. In 2020, just before the COVID shutdown, Appellee and Appellant began talking and texting again. The parties started dating, and dated exclusively from April, 2020, through September, 2021. They broke up for several months, but began seeing each other again in November, 2021. The relationship ended permanently in February, 2022.

**{¶4}** Appellee recalled an argument with Appellant in July, 2021, during which Appellant picked up a pair of scissors and "began shaking them and walking towards me, pointed them at me." *Id.* at 17. Appellee recorded the incident. She left Appellant's

---

[1] Appellee has not filed a Brief in this matter.

residence. When Appellee arrived home, she called her parents and friends, and told them about the situation.

{¶5} Sometime after the parties' break-up in February, 2022, Appellant returned Appellee's belongings, including Appellant's copy of Appellee's house key. Appellee was not at home when Appellant returned her things. On February 15, 2022, Appellee arrived home after work and was talking on the telephone to her mother. She heard a vehicle pull into the driveway. Appellee informed her mother it was Appellant. Appellee's mother told her not to answer the door. Appellant began yelling at Appellee and threatening her. Using a key to Appellee's home he had duplicated without permission, Appellant unlocked the front door. Appellee's mother hung up, telling Appellee she was calling the police. When Appellee told Appellant the police were on the way, he "busted in forcefully and just was going crazy, psycho." *Id.* at 18. Appellant fled before the officers arrived. Upon the advice of the officers from the Johnstown Police Department, Appellee filed a No Trespass Warning. She was informed Appellant would be served that evening. Appellee stated, after the February 15, 2022 incident, she was fearful and would have friends or family members stay the night with her.

{¶6} On May 17, 2022, Appellee's boss called Appellee, who was a nurse, into her office. Appellee's boss informed Appellee an unidentified male had called the facility several times while she was on vacation. The unidentified male asked when Appellee was working, what her hours were, and what days she was scheduled to work. The unidentified male called from private and anonymous numbers and never gave a name. Appellee's boss indicated the unidentified male made a number of allegations about her, claiming Appellee was abusing and harming patients, drinking alcohol on the job, stealing

work supplies and narcotic drugs, as well as other incidents of negative behaviors which would be unprofessional as a nurse. The unidentified male advised Appellee's boss he had filed a complaint and investigation with the Ohio Board of Nursing. Appellee's boss had recorded the calls. Appellee immediately recognized Appellant's voice. Appellee contacted police, who advised her to file for a protection order.

{¶7} Appellee explained, after the February 15, 2022 incident, she changed the locks on all of the doors of her residence, installed security cameras, and completed self-defense classes. Appellee stated she was scared for her life, unable to sleep, and could not focus. Even after Appellee filed the CPO, Appellant called her friends, "friended" her co-workers on social media, and inquired about her through mutual friends. Appellee indicated she was afraid of losing her career and was afraid of going out by herself.

{¶8} The trial court admitted Appellee's Exhibit 5, the No Trespass Warning issued by the Village of Johnstown Police on February 15, 2022; Exhibit 6, an email to Appellee from Jerry Zachariah, an enforcement agent with the Ohio Board of Nursing; Exhibits 7-15, text messages between Appellee and friends, and Appellee and Appellant; Exhibits 16-18, Appellant's dating website profile; and Exhibit 19, a flash drive containing (1) an audio of recording of a call from an unidentified male to Appellee's boss, and (2) videos of the July, 2021 incident with the scissors.

{¶9} On cross-examination, Appellee explained she resumed her relationship with Appellant on November 19, 2021, "after he blackmailed me that if I didn't give him a second chance he would tell my boyfriend." *Id.* at 44.

{¶10} Kimberly Collins, Appellee's mother, testified about the February 15, 2022 incident from her perspective. Collins also described the physical and emotional effects

Appellee suffered as a result of Appellant's behavior. Collins corroborated Appellee's testimony as to the effects Appellant's behavior had on her.

{¶11} Appellant testified he met Appellee on "a sugar daddy site called Seeking Arrangements" in 2017. *Id.* at 107.[2] Appellant stated the parties reconnected in 2020, on the same site. He described his relationship with Appellee as "turbulent." Appellant's only criminal history was a DUI in 1996, and a second DUI in 2003. When asked to explain why he picked up a pair of scissors during the July, 2021 argument, Appellant stated it was "for a joke." *Id.* at 110. Appellant disagreed with Appellee's version of the events of the July, 2021 argument. Appellant added he and Appellee "had these arguments all the time and it seemed like . . . if we weren't arguing there was something going on." *Id.* at 111.

{¶12} Appellant described an incident in September, 2021. He and Appellee had plans for the weekend. Appellee texted Appellant and told him her friend wanted her to go a football game. Appellee sent Appellant screenshots of the text messages between herself and her friend, which revealed the football game was actually a double-date. Appellant confronted Appellee and an argument ensued. Appellant conceded he "did use some harsh words," calling Appellee's actions "whore-ish behavior." *Id.* at 116. The parties attempted counseling, but broke up in October, 2021. Appellant returned Appellee's house key and the parties arranged for Appellee to collect her belongings.

{¶13} Appellee texted Appellant a birthday greeting in early November, 2021, and the parties began to date again. Appellant maintained Appellee contacted him and "tried sucking me back into the relationship." *Id.* at 121. On February 13, 2022, the parties

---

[2] Appellee, who appeared pro se, objected to Appellant's testimony the parties met in 2017, calling it "a lie." Tr. at 107.

planned a Valentine's Day dinner.  Appellee arrived two hours late.  Appellant stated he knew Appellee, who had been sober for approximately one year, had been drinking.  An argument ensued and Appellant asked Appellee to leave.  The next day, Appellant went to Appellee's home because he "wanted closure."  *Id.* at 130.  Because Appellee's daughter was with Appellee, Appellant did not think it was an appropriate time for the conversation and he left.  On February 15, 2022, Appellant found a Valentine's Day card in his mailbox.  There was no stamp on the envelope and the envelope was simply addressed "Travis."  Appellant proceeded to Appellee's home to talk.  Appellant adamantly denied forcing his way into Appellee's home.  Appellant stated the key he used to enter Appellee's house was a key she had given him.

{¶14} Appellant admitted he contacted Appellee's employer and the Ohio Board of Nursing in retaliation for Appellee's damaging his new relationship and her harassment of him.  Appellant added he was also "concerned" as "people are trusting her for healthcare and she's, you know, not taking it serious and – and – doing these things." *Id.* at 141. Appellant asserted he had not had any contact with Appellee since February 15, 2022.  He indicated the CPO was interfering with his life and Appellee was using it as a weapon against him.

{¶15} On July 5, 2022, the magistrate issued a Dating Violence Civil Protection Order (DVCPO) Full Hearing (R.C. 3113.31), effective until May 25, 2025.  The magistrate also issued Findings of Fact and Conclusions of Law.  Appellant filed objections to the magistrate's decision, arguing there was insufficient evidence to establish a "pattern of conduct" and "mental distress," and his First Amendment Rights were violated.  Via Judgment Entry and Opinion filed September 12, 2022, the trial court overruled

Appellant's objections to the magistrate's order and upheld the CPO with following modification: "The terms of the Civil Protection Order shall be effective until May 25, 2023." September 12, 2022 Judgment Entry.

**{¶16}** It is from this judgment entry Appellant appeals, raising the following assignments of error:

I. THE TRIAL COURT ERRED IN ISSUING A CIVIL STALKING PROTECTION ORDER AGAINST APPELLANT-RESPONDENT AS APPELLEE-PETITIONER FAILED TO ESTABLISH BY A PREPONDERANCE OF COMPETENT, CREDIBLE EVIDENCE THAT (1) THERE WAS SUFFICIENT EVIDENCE TO ESTABLISH THAT APPELLANT-RESPONDENT ENGAGED IN A "PATTERN OF CONDUCT" AS DEFINED IN THE MENACING BY STALKING STATUTE, OHIO REVISED CODE 3902.211(D)(1) FOR A STALKING CIVIL PROTECTION ORDER, PURSUANT TO OHIO REVISED CODE 2903.214; (2) THERE WAS SUFFICIENT EVIDENCE THAT APPELLEE-PETITIONER SUFFERED FROM "MENTAL DISTRESS" AS A RESULT OF APPELLANT-RESPONDENT AS DEFINED IN OHIO REVISED CODE 2903.211(D)(2); OR IN THE ALTERNATIVE, THE COURT ABUSED ITS DISCRETION IN GRANTING THE APPELLEE'S PETITION FOR A STALKING CIVIL PROTECTION ORDER.

II. APPELLANT-RESPONDENT'S FIRST AMENDMENT RIGHTS WERE VIOLATED WHEN THE TRIAL COURT RELIED ON APPELLANT-

RESPONDENT'S CALL TO THE OHIO BOARD OF NURSING AS A FACTOR IN DECIDING TO ISSUE A CIVIL STALKING PROTECTION ORDER.

*Standard of Review*

**{¶17}** The decision whether to grant a civil protection order lies within the sound discretion of the trial court. *Singhaus v. Zumbar*, 5th Dist. Tuscarawas No. 2015AP020007, 2015-Ohio-4755. Therefore, an appellate court should not reverse the decision of the trial court absent an abuse of discretion. To find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**{¶18}** A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

I

**{¶19}** In his first assignment of error, Appellant asserts the trial court erred in granting a CPO against him because Appellee failed to establish by a preponderance of

the evidence he engaged in a pattern of conduct and she suffered mental distress as a result. We disagree.

**{¶20}** In order to obtain a domestic violence civil protection order pursuant to R.C. 3113.31, the petitioner must prove by a preponderance of the evidence the respondent has engaged in an act of domestic violence against petitioner or petitioner's family or household members. *Felton v. Felton*, 79 Ohio St.3d 34, 42, 679 N.E.2d 672 (1997). "Preponderance of the evidence" is "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." *Horne v. Stafford*, 5th Dist. Fairfield No. 20-CA-17, 2020-Ohio-5073, 2020 WL 6306049, ¶ 10 (Citation omitted).

**{¶21}** R.C. 3113.31(A)(1) defines the term "domestic violence," in relevant part, as follows:

> The occurrence of one or more of the following acts against a family or household member:
>
> * *
>
> (ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [Menacing by Salking] or 2911.211 of the Revised Code [Aggravated Trespass].
>
> R.C. 3113.31(A)(1)(a)(ii).

**{¶22}** The trial court found Appellee established, by a preponderance of the evidence, Appellant committed domestic violence by engaging in menacing by stalking, in violation of R.C. 2903.211, which provides, in relevant part:

No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

R.C. 2903.211.

**{¶23}** "Pattern of Conduct" means:

[T]wo or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents * * * directed at one or more persons employed by or belonging to the same corporation, association, or other organization. * * * or the posting of messages, use of intentionally written or verbal graphic gestures, or receipt of information or data through the use of any form of written communication or an electronic method of remotely transferring information, * * * may constitute a "pattern of conduct."

R.C. 2903.211(D)(1).

**{¶24}** "Mental distress" means any of the following:

Any mental illness or condition that involves some temporary *substantial incapacity*;

Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2).

**{¶25}** "Mental distress need not be incapacitating or debilitating." *A.V. v. McNichols*, 4th Dist. Hocking No. 18CA17, 2019-Ohio-2180, 137 N.E.3d 534, ¶ 22 (Internal quotations and citation omitted). However, "mental distress for purposes of menacing by stalking is not mere mental stress or annoyance." *McKinley v. Kuhn*, 4th Dist. Hocking No. 10CA5, 2011-Ohio-134, 2011 WL 281135, ¶ 17 (Internal quotations and citation omitted). Rather, an "[i]ncapacity [from a "mental illness"] is substantial if it has a significant impact upon the victim's daily life, such as causing a change in one's routine." *McNichols*, supra at ¶ 22 (Citation omitted).

**{¶26}** The record establishes Appellant called Appellee's place of employment on several occasions while she was on vacation, not only inquiring as to her work schedule, but also making allegations to her supervisor Appellee was using illegal drugs, consuming alcohol prior to starting her workday, and stealing medication from patients. Appellant conceded he called Appellee's employer in retaliation for her actions since their break-

up. Appellant indicated he heard Appellee was given a breathalyzer while at work as a result of his allegations. Appellant also contacted the Ohio Board of Nursing to report Appellee's conduct, which he knew could potentially lead to her having her nursing license revoked.

{¶27} Additionally, on February 15, 2022, Appellant went to Appellee's home. Appellant explained he wanted to confront Appellee for "closure" after the termination of their relationship. After knocking on the door with no response, Appellant let himself into the residence with a key he had copied without permission. Appellee was on the phone with her mother when Appellant entered. Appellant yelled and threatened Appellee when he learned her mother had called the police. During a prior incident in July, 2021, when the parties were arguing, Appellant picked up a pair of scissors and began twirling them around his fingers. Appellant rationalized he was twirling the scissors as a "joke" and he could have twirled one of the knives on the kitchen counter instead.

{¶28} Appellee testified the above incidents, as well as other events, caused her to suffer severe mental distress. Appellee indicated she was unable to eat, work, and sleep. Appellee was afraid to stay in her home alone, having family or friends stay with her. She was also afraid to go to the grocery store alone. Appellee's mother corroborated her testimony.

{¶29} Based upon the foregoing, we find Appellee established by a preponderance of the evidence Appellant engaged in a pattern of conduct in an attempt to harass and/or intimidate Appellee, and as a result of this conduct, Appellee suffered mental distress which significantly affected her daily life. Accordingly, we find the trial court did not abuse its discretion in issuing a civil protection order against Appellant.

{¶30} Appellant's first assignment of error is overruled.

II

{¶31} In his second assignment of error, Appellant contends his First Amendment Rights were violated when the trial court relied upon his call to the Ohio Board of Nursing as a factor in deciding to issue the CPO. We disagree.

{¶32} Ohio courts have held R.C. 2903.211 does not chill constitutionally protected speech or conduct. *State v. Smith*, 126 Ohio App.3d 193, 210, 709 N.E.2d 1245 (1998). In *Smith,* the Seventh District Court of Appeals found, "Appellant was not prosecuted because he picketed an abortion clinic, he was prosecuted because he engaged in a pattern of conduct which caused the complainant mental distress and caused him to believe that appellant would cause him physical harm." *Id.* "We do not believe it is fairly within the protection of the First Amendment's guarantee of free speech to knowingly cause another to believe one will cause physical harm or mental distress to him or her by engaging in two or more actions or incidents closely related in time." *Kreuzer v. Kreuzer*, 144 Ohio App.3d 610, 614, 761 N.E.2d 77 (2001) (Citation and emphasis omitted).

{¶33} Appellee testified as to the great deal of mental distress and fear she experienced as a result of Appellant's repeated phone calls to her employer and report to the Ohio Board of Nursing, alleging Appellant used illegal drugs, drank alcohol before work, and stole prescription medication from patients, which resulted in an investigation of Appellee. Although the investigation was subsequently closed, Appellee continued to experience the mental distress and fear caused by Appellant's actions. Appellant

admitted he made the call to the Nursing Board in retaliation because, according to Appellant, Appellee damaged his new relationship and harassed him.

{¶34} Upon review, we find the trial court issued the CPO against Appellant, not because he exercised his First Amendment right to free speech, but because it found he engaged in a pattern of conduct which caused Appellee mental distress. This conduct is not within the protection of the First Amendment's guarantees.

{¶35} Appellant's second assignment of error is overruled.

{¶36} The judgment of the Licking County Court of Common Pleas, Domestic Relations Division, is affirmed.

By: Hoffman, P.J.
Delaney, J. and
Baldwin, J. concur