[Cite as *Sluka v. Sluka*, 2024-Ohio-5957.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JESSICA SLUKA | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2024 AP 03 0010 |
| DAVID SLUKA | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Court of Common Pleas, Case No. 2023 VI 06 0242

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     December 20, 2024

APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

NICOLE R. STEPHAN      DAN GUINN
203 Fair Avenue NE      232 West 3rd Street, Suite 312
New Philadelphia, Ohio 44663      Dover, Ohio 44622

*Wise, J.*

{¶1} Appellant David L. Sluka appeals the decision of the Court of Common Pleas, Tuscarawas County, Ohio granting the appellee Jessica D. Sluka a civil protection order pursuant to R.C. 3113.31.

## FACTS AND PROCEDURAL HISTORY

{¶2} On June 26, 2023, appellee Jessica D. Sluka, petitioned the Tuscarawas County Common Pleas Court for an emergency civil protection order claiming that she needed protection from her father in law, appellant David L. Sluka. She requested the protection for herself, her husband, and her three minor children.

{¶3} In her petition, Jessica alleged that she and her family needed protection from the obsessive and controlling behaviors of David, including stalking and spying. In a three-page typewritten addendum she outlined claims of verbal threats, opening of mail by David addressed to her and her husband, drive-bys by David at her place of employment, and Facebook threats. She alleged one physical incident in 2011 where David threw an end table at her while she was holding her infant son. Petition for Domestic Violence Civil Protection Order (R.C. 3113.31), June 26, 2023.

{¶4} An ex parte order was granted by a Magistrate, and David was ordered to stay 500 feet from the petitioner, her husband, and her three minor children. Temporary order, June 26, 2023. The order was served upon David by the sheriff and did not require the seizure of weapons.

{¶5} The matter was set for a full hearing on July 5, 2023 in the Magistrate's Courtroom in the Tuscarawas County Courthouse. On July 5, 2023, both parties

appeared before the Magistrate with counsel. However, a full hearing could not be completed because of insufficient time, and the matter was continued to July 26, 2023.

{¶6} On July 26, 2023, the matter went forward but was not completed and was continued to August 30, 2023.

{¶7} Five witnesses appeared on behalf of the petitioner, including her husband and various law enforcement personnel. Petitioner also testified on her own behalf.

{¶8} Petitioner testified that she feared for her life, described incidents where respondent opened her mail, delivered property to her family residence when he was told by law enforcement numerous times to stay away, drove by her place of employment, and threw an end table at her in 2011 when she was moving out of respondent's residence with her husband and child.

{¶9} Petitioner's husband and the son of respondent testified. He described how respondent came to his place of employment and his actions resulted in his termination. ". . . I went on a couple service calls. I come back, I ended up getting fired at 2:30 in the afternoon because in my CEO's words, 'my dad is a lunatic, he's got screws lose [sic]', and they feel it was a liability for me to be working there because they did not want sheriffs being called for instances like that." Tr. 2, July 26, 2023 at 64.

{¶10} Petitioner's husband testified that respondent continued to harass him and petitioner even after respondent was told by law enforcement to leave the family alone. Here is petitioner's husband:

> So, contact continued in more ways than one. Driving up and down
> the road, driving past my wife's work, threatening text messages to friends
> of mine, family members of mine, threatening messages to be delivered via

sales reps that come to my work facility, as long as – opening our personal mail, taking it out of our mailbox and putting it in our mailbox, threats involving, you know, they're gonna ruin our lives, ruin her, my wife's life, threats about coming to my work to ruin my life. Tr. 2, July 26, 2023 at 64-65.

**{¶11}** Three members of law enforcement testified they talked with appellant-respondent several times and told him to leave petitioner and her family alone. Appellant responded by telling law enforcement he would do whatever he wants to do. When law enforcement tried to explain to appellant they did not want him to get in trouble, appellant responded, "I don't give a shit."

**{¶12}** Respondent sent his son a message on October 22, 2022:

I don't know what your deal is, but this problem is not going to go away until you give me my stuff back, as I have given you and your family way more than anyone should have. Your wife is a piece of shit. She needs to grow up and until you get away from her your life is going to be full of problems. Me and your mom have decided to be done with you guys. No trouble, but if you don't get my stuff back I'm gonna to start causing problems. Don't push me to start. Remember, I am not a dumb person like your wife thinks. I have a lot up my sleeve. I really wish you and your family didn't have my last name. You should get it changed as you are not a son that I raised. We hope you get away from your wife and begin a better life, but you will be stupid and continue to be miserable. Like I said, just bring

my stuff back.  You have until Sunday at noon or shit will happen promise.

Tr. 2, July 26, 2023 at 51-52.

{¶13}  For his part, appellant-respondent testified on his behalf. He denied ever threatening the petitioner, his daughter-in-law, but wanted to address a few issues.  He then described a time when he protected the petitioner, his son and grandson at a racetrack – "I protected all them people, and beat them people up and got throwed out of there...That's the only violence that they've ever witnessed from me."  Tr. 2, July 26, 2023 at 84.

{¶14}  As to the allegation that he got his son fired from his job, appellant explained that he only went to his son's place of employment to tell his boss that he was returning the merchandise his son had stolen from his employer.

{¶15}  On the last day of the evidentiary hearing, August 30, 2023, appellant appeared without counsel and was allowed to make a statement.  Appellant stated that his mother was turning his son, the petitioner's husband, over to the Dover City Police for stealing tools from his employer. He further reported that he was filing a report with the sheriff for personal property that his son stole from him and was selling on Facebook.

{¶16}  As to the appellee, he reported that he filed a complaint against her for being represented by a public defender when she was not income eligible, and that he was suing petitioner and her husband, his son, for defamation.

{¶17}  At the conclusion of the hearing, the Magistrate found by a preponderance of the evidence that David was stalking the petitioner and her family. She granted the civil protection order and ordered respondent to stay 500 feet from the petitioner and her family for a period of five years.  In addition, David was ordered to turn over all deadly weapons,

including firearms and ammunition, to law enforcement and ordered not to possess, use, carry or obtain any deadly weapon including firearms and ammunition, Order, Sept. 5, 2023.

**{¶18}** On September 14, 2023, David filed objections to the Magistrate's Decision and a request for transcripts of the three hearings. Later, a more detailed supplemental objections was filed in the trial court.

**{¶19}** On January 22, 2024, the matter came on for non-oral hearing.

**{¶20}** On February 28, 2024, the trial court issued a nine-page judgment entry containing Findings of Fact and Conclusions of Law.

**{¶21}** The trial court concluded that David failed to show that an error of law or other defect occurred in the Magistrate's Decision and further found that credible evidence existed to grant the domestic violence civil protection order. It overruled David's objections and ordered that the protection order shall be in effect until June 26, 2025., Judgment Entry, Feb. 28, 2024 at 9. The judge modified the length of the protection order from five years to two years.[1]

**{¶22}**         David filed a timely notice of appeal arguing one assignment of error.

ASSIGNMENT OF ERROR

**{¶23}** "THE COURT ABUSED ITS DISCRETION AND ERRED IN GRANTING A CIVIL PROTECTION ORDER FOR THE APPELLEE AGAINST THE APPELLANT."

**{¶24}** In his sole assignment of error, appellant contends that there was insufficient evidence to grant the protection order and the trial court abused its discretion

---

[1] A no-contact order was also issued that respondent have no contact with the children's babysitter.

in granting it. According to appellant, he was abiding by his daughter in law's order to stay away from her, her family, including the appellant's son, and their three minor children.

**{¶25}** We find that the trial court made a careful and detailed analysis of the evidence presented at the evidentiary hearing and did not abuse its discretion in ordering the protection order as modified for a period of two years.

**{¶26}** The decision whether to grant a civil protection order lies within the sound discretion of the trial court. Therefore, an appellate court should not reverse the decision of the trial court absent an abuse of discretion. *Caldwell v. Koehler,* 2023-Ohio-4527, ¶ 17 (5th Dist.) citing *Singhaus v. Zumbar,* 2015-Ohio-4755 (5th Dist.). To find an abuse of discretion, the standard set forth in *Blakemore v. Blakemore,* 5 Ohio St.3d 217 (1983) applies. We must determine whether the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment.

**{¶27}** Great deference is given to the trial court because the trial judge and/or magistrate is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the testimony. *Seasons Coal Co. v. City of Cleveland,* 10 Ohio St.3d 77 (1984).

**{¶28}** Pursuant to R.C. 3113.31, to be entitled to a domestic violence civil protection order, the petitioner must show by a preponderance of the evidence that the respondent engaged in an act of domestic violence. *McBride v. McBride,* 2012-Ohio-2146, ¶ 12 (12th Dist.) citing *Felton v. Felton,* 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. Preponderance of the evidence is "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it, that

is, evidence which as a whole, shows that the fact sought to be proved is more probable than not." *Caldwell v. Koehler,*2023-Ohio-4527 (5[th] Dist.) at ¶ 19 citing Black's Law Dictionary 1182 (6[th] Ed. 1990).

**{¶29}** In this case, the trial court found that respondent was engaged in "stalking" the petitioner and her family. As relevant here, domestic violence by stalking is defined in R.C. 3113.31 (A)(1) as the occurrence of one or more acts against a family or household member that violates R.C. 2903.211 [menacing by stalking].

**{¶30}** R.C. 2903.211(A)(1) defines menacing by stalking in relevant part as "[N]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person. . . or cause mental distress to the other person. . .

**{¶31}** "Pattern of conduct" is defined in R.C. 2903.211(D)(1) as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of these actions or incidents."

**{¶32}** "Mental distress" is defined in R.C. 2903.211(D)(2) as:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

{¶33} The statute does not require that the victim actually experience mental distress, but only that the victim believes the stalker would cause mental distress or physical harm. *Z.J. v. R.M.,* 2023-Ohio-3552, ¶ 11 (5th Dist.).

{¶34} Upon review, we find that the appellee-petitioner presented competent and credible evidence that appellant-respondent knowingly engaged in a pattern of conduct that caused petitioner and her family mental distress.

{¶35} The evidence established that appellant-respondent has demonstrated his dislike for appellee in her role as the wife of his son since at least 2022 when appellee stopped allowing appellant and his wife to visit or babysit the three minor children of appellee and her husband out of fear for a cousin who was exhibiting inappropriate behavior.

{¶36} As a result, appellant began a series of text messages and social media posts disparaging her role in appellant's son's life including such statements as "his [husband] life will be bad as long as she [petitioner] is in it.

{¶37} While some of the messages were merely derogatory, others were more ominous.

RESPONDENT:     I intend to do anything I can do to cause her [petitioner] problems. . .

I am just getting started.

{¶38} Appellant committed acts that led to appellee's fear of appellant including driving by her place of employment, opening mail in her mailbox clearly addressed to her, trespassing at her home after being warned by law enforcement to stay away, and visiting appellee's husband's place of employment which resulted in getting him fired.

**{¶39}** To commit acts of stalking, a person must knowingly cause the victim to believe that the offender will cause the victim mental distress. *Gilbreath v. Kinderkine,* 2004-Ohio-868, ¶ 8 (2d Dist.) ("A person acts knowingly regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.") The culpable mental state of knowingly may be demonstrated by direct evidence as well as circumstantial evidence. *State v. Rigsbee,* 2023-Ohio-1494, ¶ 23 (10th Dist.). ("When determining whether a defendant acted knowingly, his state of mind may be inferred from the totality of the circumstances surrounding the conduct.")

**{¶40}** The evidence demonstrated appellant-respondent continuously interfered with appellee-petitioner and her family. His interference was demonstrated in many ways, including harassment by social media, visiting their home and work sites when he was told by law enforcement to stay away, and even continued harassment at the hearings. From appellant's own testimony at the evidentiary hearings, the trial court could conclude appellant knowingly caused appellee and her family, including his own son mental distress that is prohibited by statute. While the majority of his acts constituted harassment and mental distress, by his own testimony, he demonstrated that he was capable of physical violence.

**{¶41}** We find that the trial court's judgment was supported by credible evidence. Therefore, the trial court did not abuse its discretion in granting the petition.

**{¶42}** Appellant's sole assignment of error is overruled.

**CONCLUSION**

{¶43} The February 28, 2024 judgment entry of the Court of Common Pleas, Tuscarawas County, Ohio, is affirmed.

By: Wise, J.

Gwin, P. J., and

Baldwin, J., concur.

JWW/kt 1217